IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

WAYNE WALKER-EL,                    :

    Plaintiff,                   :

vs.                                 :      CIVIL ACTION 03-0570-BH-M

NAPHCARE MEDICAL SERVICES,          :
INC., et al.,
                                    :
    Defendants.

REPORT AND RECOMMENDATION

    Plaintiff, an Alabama prison inmate proceeding pro se and in forma pauperis filed a Complaint under 42 U.S.C. § 1983.  This action was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.2(c)(4), and is now before the undersigned on the motions for summary judgment of Defendants, Donal Campbell, Grantt Culliver, Levan Thomas (Doc. 25, 43), Dr. Robert Barnes, Charlene Gandy, Naphcare Medical Services, Inc. ("Naphcare") (Doc. 28, 36, 39), and Dr. Ben C. Wouters (Docs. 88, 89); and Plaintiff's Opposition thereto  (Docs. 29, 48, 80, 81, 82).  For the reasons stated below, it is recommended that the motions for summary judgment of Defendants Campbell, Culliver, Thomas, Barnes, Gandy, Naphcare, and Wouters be granted and that Plaintiff's action against these Defendants be dismissed with prejudice.  In addition, it is recommended that Plaintiff's claim against Defendant Margaret Colbert be dismissed with prejudice under § 1915(e)(2)(B)(ii) for failure to state a claim upon which

relief could be granted.[1]

## I.  SUMMARY OF FACTUAL ALLEGATIONS

From its review of the record, the Court summarizes the parties' allegations that are material to the issues addressed in this Report and Recommendation.  Plaintiff, an Alabama inmate, is incarcerated at Holman Correctional Facility ("Holman"), having been convicted of attempted murder and robbery and sentenced to life imprisonment without the possibility of parole.  (Doc. 4 at 4, 7).  Plaintiff claims that, since March of 2002, while incarcerated at Holman, he has been denied medical treatment for lower back and hip problems.  (Id. at 10).  According to Plaintiff, in March, 2002, he collapsed on the floor while brushing his teeth and, after being examined by the prison medical personnel, was told that nothing was wrong.  (Id.).  Plaintiff claims that, as a result of Defendants' refusal to provide him adequate medical treatment, he has suffered constant

---

[1] It is unclear from the record whether Defendant Margaret Colbert has been properly served with the Complaint in this case. However, having determined herein that Plaintiff's allegations related to his medical treatment for back problems during his incarceration at Holman Correctional Facility fail to establish any constitutional violation, Plaintiff's claims against Defendant Colbert related to that medical treatment are due to be dismissed under § 1915(e)(2)(B)(ii) for failure to state a claim upon which relief could be granted.  See Hishon v. King & Spaulding, 467 U.S. 69, 73 (1984) (a complaint may be dismissed under 28 U.S.C. § 1915(e)(2)(B)(ii) for failure to state a claim upon which relief may be granted if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.").

pain in his lower back and hip and walks in a stooped position. (<u>Id.</u>).

## II. PROCEDURAL ASPECTS OF THE CASE

On August 26, 2003, Plaintiff filed his Complaint under 42 U.S.C. § 1983. (Doc. 1). On October 9, 2003, the Court ordered Plaintiff to refile his Complaint on this Court's form, which Plaintiff did on November 12, 2003, alleging that Commissioner Donal Campbell, Warden Grantt Culliver, Assistant Warden Levan Thomas, Dr. Robert Barnes, Nurse Charlene Gandy, Dr. Ben Wouters,[2] Naphcare, and Nurse Margaret Colbert violated his Eighth Amendment rights by refusing to provide him medical treatment for his lower back and hip problems. (Doc. 4 at 6; Doc. 14 at 1-2). Plaintiff seeks compensatory and punitive damages for Defendants' deliberate indifference to his serious medical needs. (Doc. 4 at 7-8, 10).

On January 26, 2004, Plaintiff amended his Complaint, reasserting his Eighth Amendment claim against Defendants for failing to provide him adequate medical treatment for his lower back and hip problems. (Doc. 14). On April 8, 2004, and September 8, 2004, Defendants Campbell, Culliver, and Thomas filed their Special Report and Answer, denying any violation of Plaintiff's constitutional rights and asserting the defenses of

---

[2] Plaintiff originally identified Dr. Ben C. Wouters as "Dr. Worley." (Doc. 4 at 9).

qualified and absolute immunity.  (Docs. 25, 43).  On April 30, 2004, and July 2, 2004, Defendants Barnes, Gandy, and Naphcare filed their Special Report and Answer, denying any violation of Plaintiff's constitutional rights and also asserting immunity to Plaintiff's claim.  (Docs. 28, 36).  Defendants Barnes, Gandy, and Naphcare supplemented their Special Report on September 1, 2004.  (Doc. 39, Exs. 1-3).  On November 22, 2005, Defendant Dr. Wouters filed his Special Report and Answer, likewise denying any violation of Plaintiff's constitutional rights and asserting immunity to Plaintiff's claim.  (Docs. 88, 89).  On May 11, 2004, November 9, 2004, October 17, 2005, October 18, 2005, and December 20, 2005, Plaintiff filed responses in opposition to Defendants' Special Reports and Answers, reasserting his Eighth Amendment claim against these Defendants.  (Docs. 29, 48, 80, 81, 82, 91).  The Court converted Defendants' Answers and Special Reports, as supplemented, to motions for summary judgment on September 26, 2005, and November 29, 2005.  (Docs. 75, 90).  Those motions are now before the Court.

<u>III. SUMMARY JUDGMENT STANDARD</u>

In analyzing the propriety of a motion for summary judgment, the Court begins with these basic principles.  The <u>Federal Rules of Civil Procedure</u> grant this Court authority under Rule 56 to render "judgment as a matter of law" to a party who moves for summary judgment.  "[S]ummary judgment is proper 'if the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact. . . .'" <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986) (quoting <u>Fed. R. Civ. P.</u> 56(c)).

The Court must view the evidence produced by "the nonmoving party, and all factual inferences arising from it, in the light most favorable to" that party. <u>Barfield v. Brierton</u>, 883 F.2d 923, 934 (11th Cir. 1989). However, Rule 56(e) states that:

> an adverse party [to a motion for summary judgment] may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

<u>Fed. R. Civ. P.</u> 56(e); <u>see also</u> <u>Celotex Corp.</u>, 477 U.S. at 325-27. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. . . . If the evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249-50 (1986) (internal citations omitted). "Summary judgment may be granted against a party who fails to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial."

<u>Liberty Mut. Fire Ins. Co. v. Sahawneh</u>, 2001 WL 530424, *1 (S.D.
Ala. May 11, 2001) (citing <u>Anderson</u>, 477 U.S. at 249-50).

IV. <u>DISCUSSION</u>

In this action, Plaintiff seeks redress for alleged
constitutional deprivations pursuant to 42 U.S.C. § 1983.
Specifically, Plaintiff alleges that Defendants' deliberate
indifference to his serious medical needs while incarcerated at
Holman Correctional Facility, *i.e.*, the denial of adequate
medical treatment for his back and hip problems after a fall in
March, 2002, violated his rights under the Eighth Amendment.[3]

--------

[3] Plaintiff does not specify whether he is suing Defendants,
Commissioner Donal Campbell, Warden Grantt Culliver, and
Assistant Warden Levan Thomas, in their official or individual
capacities or both.  Thus, the Court will consider both.
Defendants Campbell, Culliver, and Thomas are state officials
and, thus, are absolutely immune from suit for damages in their
official capacities.  <u>See</u> <u>Harbert Int'l, Inc. v. James</u>, 157 F.3d
1271, 1277 (11th Cir. 1998) (state officials sued in their
official capacities are protected from suit for damages under the
Eleventh Amendment).  Moreover, "[q]ualified immunity protects
government officials performing discretionary functions from
suits in their individual capacities unless their conduct
violates 'clearly established statutory or constitutional rights
of which a reasonable person would have known.'" <u>Dalrymple v.
Reno</u>, 334 F.3d 991, 994 (11th Cir. 2003) (quoting <u>Hope v. Pelzer</u>,
536 U.S. 730, 739 (2002)).  In determining whether qualified
immunity is appropriate in a given case, "[t]he court must first
ask the threshold question whether the facts alleged, taken in
the light most favorable to the plaintiffs, show that the
government official's conduct violated a constitutional right."
<u>Dalrymple</u>, 334 F.3d at 995 (citing <u>Saucier v. Katz</u>, 533 U.S. 194,
201 (2001)).  Having found herein that Plaintiff's allegations do
not establish a constitutional violation, "there is no necessity
for further inquiries concerning qualified immunity."  <u>Saucier</u>,
533 U.S. at 201.

     As private entities, the remaining Defendants, namely, Dr.

6

For the reasons set forth below, the Court finds that Plaintiff's allegations fail to establish any constitutional violation by Defendants.  Thus, it is recommended that Defendants' Motions for Summary Judgment be granted.

<u>Denial of Adequate Medical Care</u>

As discussed above, in this action, Plaintiff alleges that Defendants were "deliberately indifferent" to his serious medical needs in violation of the Eighth Amendment by failing to provide proper medical treatment for him during his incarceration at Holman Correctional Facility.  Specifically, Plaintiff alleges that, "[i]n March, 2002, Plaintiff while brushing his teeth in Dorm #4 at Holman Correctional Facility experience[d] problems with his hip portion of his lower back, and collapse[d] on the restroom floor."  (Doc. 4 at 10).  Plaintiff states that he was

---

Robert Barnes, Nurse Charlene Gandy, Naphcare, Nurse Margaret Colbert, and Dr. Ben C. Wouters, are not entitled to immunity, whether qualified or absolute.  <u>See</u> <u>Swann v. Southern Health Partners, Inc.</u>, 388 F.3d 834, 837 (11th Cir. 2004) ("The parties agree that as a private entity, SHP [a private corporation employed by the county to provide medical care to inmates at the county jail] is not entitled to assert a qualified immunity defense."); <u>Hinson v. Edmond</u>, 205 F.3d 1264, 1265 (11th Cir. 2000) (a "privately employed prison physician [ ] is ineligible to advance the defense of qualified immunity"); <u>Edwards v. Alabama Dep't of Corrections</u>, 81 F. Supp. 2d 1242, 1254 (M.D. Ala. 2000) (a "private entity" contracting with a state to provide medical services to state inmates "is not entitled to qualified immunity...."). With respect to absolute immunity, Defendants have cited no case, and the Court is aware of no case, extending absolute immunity to privately employed medical companies or privately employed physicians and nurses providing medical services to state inmates.

assisted to the prison infirmary by correctional officers and, "after examination and review of [his] medical file," was told that there was nothing wrong and that he would not be sent to the infirmary at Kilby Correctional Facility for medical treatment. (Id.). According to Plaintiff, Defendant Dr. Barnes ordered x-rays and placed Plaintiff on high blood pressure medication. (Id.). Plaintiff states that, since that time, his condition has slowly deteriorated; he has been in constant pain; and his requests for treatment have gone unheeded. (Id.).

The Eighth Amendment provides that, "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. "The Eighth Amendment's proscription of cruel and unusual punishments prohibits prison officials from exhibiting deliberate indifference to prisoners' serious medical needs." Campbell v. Sikes, 169 F.3d 1353, 1363 (11th Cir. 1999) (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)). In Sims v. Mashburn, 25 F.3d 980 (11th Cir. 1994), the Eleventh Circuit delineated the objective and subjective portions of an Eighth Amendment claim as follows:

> An Eighth Amendment claim is said to have two components, an objective component, which inquires whether the alleged wrongdoing was objectively harmful enough to establish a constitutional violation, and a subjective component, which inquires whether the officials acted with a sufficiently culpable state of mind.

<u>Sims</u>, 25 F.3d at 983 (citing <u>Hudson v. McMillian</u>, 503 U.S. 1, 8 (1992)).

To meet the objective element required to demonstrate a denial of medical care in violation of the Eighth Amendment, a plaintiff first must demonstrate the existence of an "objectively serious medical need." <u>Farrow v. West</u>, 320 F.3d 1235, 1243 (11th Cir. 2003). A serious medical need is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" <u>Id.</u> (quoting <u>Hill v. Dekalb Reg'l Youth Det. Ctr.</u>, 40 F.3d 1176, 1187 (11th Cir. 1994)). "In either of these situations, the medical need must be one that, if left unattended, pos[es] a substantial risk of serious harm." <u>Id.</u> (internal quotation marks and citation omitted).

In order to meet the required subjective element of an Eighth Amendment denial of medical care claim, a plaintiff must demonstrate "deliberate indifference" to a serious medical need. <u>Id.</u>

> In <u>Estelle</u>, the Supreme Court established that "deliberate indifference" entails more than mere negligence. <u>Estelle</u>, 429 U.S. at 106, 97 S. Ct. 285; <u>Farmer</u>, 511 U.S. at 835, 114 S. Ct. 1970. The Supreme Court clarified the "deliberate indifference" standard in <u>Farmer</u> by holding that a prison official cannot be found deliberately indifferent

9

under the Eighth Amendment "unless the
official *knows of* and *disregards an excessive
risk to inmate health or safety*; the official
must both be aware of facts from which the
inference could be drawn that a substantial
risk of serious harm exists, and he must also
draw the inference." <u>Farmer</u>, 511 U.S. at
837, 114 S. Ct. 1970 (emphasis added).  In
interpreting <u>Farmer</u> and <u>Estelle</u>, this Court
explained in <u>McElligott</u> that "deliberate
indifference has three components: (1)
subjective knowledge of a risk of serious
harm; (2) disregard of that risk; (3) by
conduct that is more than mere negligence."
<u>McElligott</u>, 182 F.3d at 1255; <u>Taylor</u>, 221
F.3d at 1258 (stating that defendant must
have subjective awareness of an "objectively
serious need" and that his response must
constitute "an objectively insufficient
response to that need").

<u>Farrow</u>, 320 F.3d at 1245-46.

For purposes of this analysis, the Court assumes, without

deciding, that Plaintiff has demonstrated an "objectively serious

medical need" in order to satisfy the first component of his

Eighth Amendment claim.  The Court turns its focus, instead, to

Plaintiff's claim that Defendants were deliberately indifferent

to his serious medical need for treatment for his back problems.

Plaintiff maintains that he has suffered from lower back

pain and stiffness that has gone untreated by Defendants since he

fell in March of 2002.  Plaintiff's medical records, however,

reflect a long history of chronic lower back problems dating back

to 1995 and extensive, ongoing treatment for those problems.

Plaintiff's medical records show that, on January 27, 1995,

10

Plaintiff complained of back pain while undergoing treatment for a brain tumor at Kilby Correctional Facility ("Kilby"). (Doc. 39-2 at 30, 82). An x-ray of his lumbar spine at that time revealed a partial sacralization of L5 but was otherwise unremarkable.[4] (Id.). Plaintiff was transferred from Kilby to Holman in April, 1995, and his radiation treatment for the pituitary tumor continued, as did his problems with back pain. (Doc. 39-2 at 24-27). Plaintiff's medical records in April and May of 1995 indicate that he was unable to lie flat and that the pain in his lower back and right hip was not responding to Vicodin, the pain medication that he had been prescribed. (Doc. 39-2 at 21-24, 80-81). The physician's notes state that Plaintiff could not straighten his spine and that he "tilt[ed] to [the] side." (Doc. 39-2 at 81). Plaintiff's pain medication was increased, and he was instructed to sit in hot whirlpool baths and refrain from lifting. (Id. at 78-80). The notes reflect uncertainty about the cause of Plaintiff's back pain but state that the pain was not severe enough for stronger narcotics. (Id. at 78). A subsequent x-ray of the lumbar spine revealed no abnormalities. (Doc. 39-2 at 20, 80). On May 30, 1995, Plaintiff reported that the pain medications relaxed him, but did not stop the pain. (Doc. 39-2 at 77). The physician's notes

---

[4] "Sacralization" is defined by the Merriam Webster Medical Dictionary as: "a congenital anomaly in which the fifth lumbar vertebra is fused to the sacrum in varying degrees."

11

provide: "I have no idea what is causing pain unless it is DJD or disc disease." (Id.).  In June, 1995, Plaintiff's medical records indicate that his tumor was stable, but he continued to have back and hip pain of an unknown origin.  (Doc. 39-2 at 18, 76).  Plaintiff was instructed regarding back exercises.  (Doc. 39-2 at 75).

In September, 1996, Plaintiff's medical records indicate that he was taken to the prison infirmary after his back "locked up" on him.  (Doc. 39-2 at 16).  In November, 1996, Plaintiff suffered a seizure and complained of severe back pain afterward.  (Doc. 39-2 at 73).  X-rays taken of Plaintiff's hips at that time showed "no evidence of recent fracture or other significant bony abnormality."  (Doc. 39-2 at 15, 73).  With respect to the lumbar spine, the x-ray report further stated: "[t]he pedicles and transverse processes are intact.  The disc spaces are maintained. No evidence of spondylolysis or spondylolisthesis" was seen. (Doc. 39-2 at 15).

Plaintiff's medical records next indicate problems in 1998, showing that Plaintiff continued to experience chronic back pain, described by the prison physician as "of arthritis type," although Plaintiff's x-rays showed no arthritis.  (Doc. 39-2 at 72).  In June, 2000, Plaintiff complained of severe back pain after suffering a fall.  (Doc. 39-2 at 14).  In November, 2000, Plaintiff continued to complain of severe back pain in his lower

back and hip and walked bent over at the waist.  (Doc. 39-2 at
13).   Plaintiff was treated with Motrin and reported: "[i]f I
take the Motrin, I don't hurt.  When it runs out I start[] to
hurt. . . ." (Doc. 39-2 at 12, 70).  In December, 2000, the
prison physician ordered another x-ray of Plaintiff's right hip
in response to Plaintiff's complaints that the pain was
worsening.  (Doc. 39-2 at 11).  The physician declined to
prescribe any stronger pain medication, as the next level of pain
medication was a narcotic.  (Doc. 39-2 at 69).  Plaintiff was
also treated for a cough and cold at that time.  (Doc. 39-2 at
10).

       In January, 2001, Plaintiff's medical records reflect that
his back was "better since taking meds and exercising." (Doc.
39-2 at 68).  In March, 2001, Plaintiff complained of his leg
"lock[ing] up" on him and having leg cramps.  (Doc. 39-2 at 6-7).
The prison physician prescribed medications and ordered more x-
rays of the lumbar spine, the thoracic spine, and both hips.
(Doc. 39-2 at 4, 6, 67).  The x-rays revealed no significant
abnormalities.[5]  In June, 2001, Plaintiff was found on the floor

_____

       [5] The report stated: "[t]he lumbar vertebrae are of good
height and alignment.  No signs of bony metastatic disease are
demonstrated.  I see no other significant findings.  Conclusion:
Negative lumbar spine." (Doc. 39-2 at 4).  "The thoracic
vertebrae are of good height and alignment.  I do not visualize a
lytic or blastic lesion.  No other significant finding is
identified.  Conclusion: Negative thoracic spine." (Id.).
"Views of the left hip demonstrate no lytic or blastic lesion.  I
do not visualize any other significant finding. Conclusion:

at Kilby after suffering a muscle spasm in his right leg.
Plaintiff was given Morphine for pain. (Doc. 39-2 at 3). After
being transferred back to Holman, Dr. Barnes treated Plaintiff
for back pain and stiffness in July and August, 2001,
prescribing, at different times, Phenobarbitol, Motrin, and
Percogesic. (Doc. 39-2 at 66, 94). Plaintiff was told that if
his stiffness worsened, to return to the clinic. (Doc. 39-2 at
66). Dr. Barnes' notes indicate that Plaintiff walked in a "bent
over" posture, and he expressed uncertainty about the source of
Plaintiff's pain. (Doc. 39-2 at 65). He ordered further x-rays
of Plaintiff's right hip and lumbar sacral spine, which showed
"no fracture with moderate levoscoliosis, reversed lordosis and
left rotation of the lower thoracic and lumbar vertebrae down to
L4," as well as "mild narrowing of some disc spaces." (Doc. 39-
1 at 78; Doc. 39-2 at 94). The report stated that the views of
the right hip were "grossly underpenetrated," and a CT scan of
the lumbar spine or MRI of the hip was recommended if the hip
pain persisted. (Doc. 39-1 at 78). Dr. Barnes continued to
prescribe Plaintiff Percogesic. (Doc. 39-2 at 93). In October,
2001, Plaintiff suffered a seizure and experienced back and hip
stiffness. (Doc. 39-2 at 65). Dr. Barnes noted that Plaintiff

---

Negative left hip." "Views of the right hip demonstrate no lytic
or blastic lesion. No other significant bony or soft tissue
abnormalities identified. Conclusion: Negative right hip."
(Id.). X-rays of Plaintiff's left and right femur also showed no
abnormalities. (Id. at 5).

"walk[ed] bent over at approximately 45 degrees." (Id.). Dr.
Barnes continued to express uncertainty as to the cause of
Plaintiff's problems, and his notes reflect that he again
considered an MRI of the spine and right hip. (Doc. 39-1 at 74;
Doc. 39-2 at 65, 92-93). Dr. Barnes subsequently ordered
additional x-rays, but the results were "suboptimal." (Doc. 39-1
at 70, 73, 75; Doc. 39-2 at 92). He continued to prescribe
Plaintiff Percogesic for pain. (Doc. 39-2 at 91-92).

In March, 2002, Plaintiff's hip "went out," causing him to
fall. (Doc. 39-1 at 71; Doc. 39-2 at 63-64). An x-ray taken at
that time was "suboptimal" but showed no fracture, and Plaintiff
was instructed to stay in bed for the weekend. (Doc. 39-1 at 69-
70; Doc. 39-2 at 61). Plaintiff's pain continued, and Dr. Barnes
prescribed Plaintiff Naprosyn. (Doc. 39-1 at 67; Doc. 39-2 at
89). On April 16, 2002, Dr. Barnes referred Plaintiff to an
orthopedist, Dr. Fletcher, for an MRI of his spine and hips.
(Doc. 39-1 at 62, 64; Doc. 39-2 at 88-89). Prior to Plaintiff's
appointment with Dr. Fletcher, Dr. Barnes ordered further x-rays
with instructions to "try for good quality x-rays." (Doc. 39-2
at 88). In May, 2002, after his initial examination, Dr.
Fletcher ordered CT scans of Plaintiff's lumbar spine and hip.
(Doc. 39-1 at 61). Plaintiff was unable to tolerate the
procedure, however, and the scans had to be postponed. (Doc. 39-
1 at 48-50, 58; Doc. 39-2 at 57). After multiple attempts over

15

several months, Plaintiff was able to tolerate a CT scan in
August, 2002, with sedation.  (Doc. 39-1 at 44, 53; Doc. 39-2 at
57).  The CT scan of the lumbar spine showed "central canal
stenosis at L3-4 and L4-5," broad based disc bulge, and disc
herniation, with likely nerve root impingement.  (Doc. 39-1 at
44-45).  The CT scan of the hips was "normal."  (Id. at 46).  In
September, 2002, Dr. Fletcher recommended that Plaintiff be
referred to a neurologist.  (Doc. 39-1 at 42).  Plaintiff saw Dr.
William J. Hamilton on December 6, 2002.  (Doc. 39-1 at 34-36,
38, 41).  Dr. Hamilton noted that Plaintiff walked flexed at the
waist at approximately 70 degrees but that he had no back pain or
limitations on how far he could walk.  (Doc. 39-1 at 34).  Dr.
Hamilton noted that Plaintiff had "well preserved strength in the
upper extremities" but that he had "difficulty in performing a
tandem gait because of his abnormal flexed posture."  (Id.).  Dr.
Hamilton recommended that he be evaluated for neurosurgery "as
soon as possible."  (Id. at 36).  On December 20, 2002, Dr.
Barnes referred Plaintiff for a "neurosurgery consult" to obtain
a second opinion on "surgical intervention."  (Doc. 39-1 at 32).

On February 4, 2003, Plaintiff saw Defendant Dr. Ben C.
Wouters, a neurologist, who determined that Plaintiff had "lumbar
radiculitis with autofusion of his back" and concluded that
surgery was indicated.  (Doc. 39-1 at 30-31, 33).  Dr. Barnes
then referred Plaintiff to Dr. Rigsby, the neurologist who had

16

treated Plaintiff's brain tumor, to ask him to perform the
operation to straighten Plaintiff's back. (Doc. 39-1 at 27).
Plaintiff's medical records indicate that an MRI was done in
June, 2003, which showed areas of severe spinal stenosis. (Doc.
39-1 at 22-23).  Dr. Barnes again requested that Dr. Rigsby
evaluate Plaintiff after the MRI.  (Doc. 39-1 at 19).  On
September 2, 2003, Dr. Rigsby examined Plaintiff and recommended
a "decompressive lumbar laminectomy." (Doc. 39-1 at 21).  After
explaining the risks to Plaintiff, Plaintiff agreed to proceed.
(Id.).  On September 22, 2003, Dr. Rigsby successfully performed
the recommended procedure.  (Doc. 39-1 at 9-10; Doc. 39-2 at 44).
The records reflect that, after the surgery, Plaintiff was able
to "stand much straighter" and that he bent over "only slightly."
(Doc. 39-1 at 9; Doc. 39-2 at 44).  On November 20, 2003, Dr.
Barnes noted that Plaintiff did not use his walker anymore and
that, since the surgery, he "walks in a much less bent over
posture." (Doc. 39-2 at 32).  In December, 2003, Dr. Barnes
noted that Plaintiff bent over only approximately 15 degrees.
(Id.).  The notes from Plaintiff's three-month follow-up visit
make no mention of any back pain.  (Doc. 39-2 at 31).  Having
considered the evidence in this action in the light most
favorable to Plaintiff, the Court finds that Plaintiff has failed
to establish an Eighth Amendment violation by these Defendants.

     As discussed above, in order to satisfy the subjective

element of an Eighth Amendment claim, Plaintiff must show that Defendants knew of and disregarded "an excessive risk to [his] health or safety." Farrow, 320 F.3d at 1245.   Stated differently, Plaintiff must show that Defendants had "subjective knowledge of a risk of serious harm," that Defendants disregarded that risk, and that Defendants did so "by conduct that is more than mere negligence." Id.   The record here, however, is devoid of evidence that Defendants had subjective knowledge of, and disregarded, a risk of serious harm to Plaintiff from his back problems.  To the contrary, the record shows that Dr. Barnes and the other prison physicians were perplexed by Plaintiff's back problems and that they constantly monitored and treated Plaintiff with pain medications, hot whirlpool baths, exercises, and diagnostic procedures from the date of his initial complaint of back pain in 1995 until his back surgery in 2003.  There is no evidence that Defendants were deliberately indifferent to the pain that he was suffering or that they ever stopped trying to improve his condition.

The Eleventh Circuit has recognized that "when a prison inmate has received medical care, courts hesitate to find an Eighth Amendment violation." Waldrop v. Evans, 871 F.2d 1030, 1035 (11th Cir. 1989).  The fact that a Plaintiff may disagree with the efficacy of the treatment recommended or simply prefer a different course of treatment does not state a valid claim of

medical mistreatment under the Eighth Amendment.  See, e.g.,
Adams v. Poag, 61 F.3d 1537, 1545 (11th Cir. 1995) ("the question
of whether governmental actors should have employed additional
diagnostic techniques or forms of treatment 'is a classic example
of a matter for medical judgment' and therefore not an
appropriate basis for grounding liability under the Eighth
Amendment.") (quoting Estelle, 429 U.S. at 107); Del Muro v.
Federal Bureau of Prisons, 2004 WL 1542216, *4 (N.D. Tex. 2004)
("[i]t is well-established that a difference in opinion or a
disagreement between an inmate and prison officials as to what
medical care is appropriate for his particular condition does not
state a claim for deliberate indifference to medical needs.").

Moreover, it is well established that "[s]imple medical
malpractice . . . does not rise to the level of a constitutional
violation."  Waldrop, 871 F.2d at 1035.  Thus, even if the Court
were to assume that Plaintiff had been incorrectly diagnosed and
treated by Dr. Barnes or the other prison physicians, of which
there is no evidence, Eighth Amendment liability cannot be
grounded on "mere negligence."  Farrow, 320 F.3d at 1245.  While
the Court recognizes that Plaintiff experienced chronic, and at
times severe, back pain for a period of approximately eight
years, there is no evidence that Defendants refused to treat him
or that they engaged in "deliberately indifferent" delay in
treating his pain or any of his other serious medical problems.

Cf., McElligott v. Foley, 182 F.3d 1248, 1257 (11th Cir. 1999)
(reversing summary judgment for a prison physician and nurse who
failed to provide pain medication, other than Tylenol, for an
inmate suffering severe abdominal pain from stomach cancer).

Inasmuch as Plaintiff's own medical records establish that
he received extensive medical treatment for his back problems,
including his chronic, severe back pain, Plaintiff has failed to
meet the subjective element of "deliberate indifference"
necessary to constitute an Eighth Amendment violation.  Thus,
Defendants are entitled to summary judgment on Plaintiff's Eighth
Amendment claim.

## V.  CONCLUSION

Based on the foregoing, it is recommended that the motions
for summary judgment of Defendants, Donal Campbell, Grantt
Culliver, Levan Thomas (Doc. 25, 43), Dr. Robert Barnes, Charlene
Gandy, Naphcare Medical Services, Inc. ("Naphcare") (Doc. 28, 36,
39), and Dr. Ben C. Wouters (Docs. 88, 89), be granted and that
Plaintiff's action against these Defendants be dismissed with
prejudice.  In addition, it is recommended that Plaintiff's claim
against Defendant Margaret Colbert be dismissed with prejudice
under § 1915(e)(2)(B)(ii) for failure to state a claim upon which
relief could be granted.


MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS

20

AND RESPONSIBILITIES FOLLOWING RECOMMENDATION
AND FINDINGS CONCERNING NEED FOR TRANSCRIPT

1.   Objection.   Any party who objects to this recommendation or anything in it must, within ten days of the date of service of this document, file specific written objections with the clerk of court. Failure to do so will bar a *de novo* determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the magistrate judge.   See 28 U.S.C. § 636(b)(1)(C); Lewis v. Smith, 855 F.2d 736, 738 (11th Cir. 1988); Nettles v. Wainwright, 677 F.2d 404 (5th Cir. Unit B, 1982)(*en banc*).   The procedure for challenging the findings and recommendations of the magistrate judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides that:

   A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten days after being served with a copy of the recommendation, unless a different time is established by order.   The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection. The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made. It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection. Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

   A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2.   Transcript (applicable where proceedings tape recorded). Pursuant to 28 U.S.C. § 1915 and Fed. R. Civ. P. 72(b), the magistrate judge finds that the tapes and original records in this action are adequate for purposes of review.   Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States

will pay the cost of the transcript.

      DONE this 13th day of February.

                                          s/BERT W. MILLING, JR.
                                          UNITED STATES MAGISTRATE JUDGE